UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

CHRISTOPHER DANIEL BROWN,

     Plaintiff,

  v.         Case No. 15-cv-237-pp

ROBERT B. JACHOWICZ,
GLEN HAASE,
BRIAN M. OLSON,
ANDREW AYALA, and
JOHN DOE, Officer, City of Cudahy Police Department,

     Defendants.

---

## DECISION AND ORDER DISMISSING DEFENDANT JOHN DOE WITH PREJUIDCE, GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 35) AND DISMISSING CASE

---

Plaintiff Christopher Daniel Brown, a former Wisconsin state prisoner who is representing himself, filed a complaint under 42 U.S.C. §1983, alleging that the defendants violated his civil rights during and after his arrest on May 26, 2014. Dkt. No. 37 at ¶2. The court screened the complaint under 28 U.S.C. §1915A, and allowed the plaintiff to proceed on Fourth Amendment claims that defendants Jachowicz, Haase, Olson, Ayala and John Doe engaged in objectively unreasonable conduct during the plaintiff's arrest, as well as during his transportation to and time at the hospital, including a blood draw. Dkt. No. 10 at 7-8.

The defendants filed their motion for summary judgment on May 31, 2016, dkt. no. 35; the plaintiff responded on August 1, 2016, dkt. no. 46; the

1

defendants replied on August 16, 2016, dkt. no. 47. The plaintiff filed an additional response to the defendants' request for summary judgment on September 13, 2016. Dkt. 50. Although the court did not authorize the plaintiff to file a sur-reply, the court has considered it. This decision and order resolves the motion for summary judgment.

The court's December 28, 2015 scheduling order set a deadline of February 29, 2016 for parties to amend pleadings, including amending the complaint to identify the party previously identified as John Doe. Dkt. No. 20 at 1. The court also advised the plaintiff that it could dismiss the party previously identified as John Doe if the plaintiff had not provided his real identity by that date. Id. The plaintiff never identified John Doe, and the court will dismiss the plaintiff's claims against John Doe with prejudice.

## I.    FACTS[1]

### A.    Parties

The plaintiff is an adult male who was a state prisoner when he filed this lawsuit; he since has been released. Dkt. No. 37 at ¶1. Defendant Glen Haase is a Sergeant with the City of Cudahy Police Department. Id. at ¶3. The

---

[1] The court takes facts primarily from the "Defendants' Proposed Findings of Fact in Support of their Motion for Summary Judgment." Dkt. No. 37. The defendants argue that the court should deem their proposed findings of fact admitted for the purpose of deciding summary judgment, because the plaintiff did not respond to them. In the interest of resolving the case on the merits, the court will consider facts the plaintiff presented in "Plaintiff's Motion to Dismiss Defendants Motion for Summary Judgment" and "Plaintiff's Response to Defendants Request for Summary Judgment," both of which are sworn. Dkt. Nos. 46, 50.

remaining defendants are City of Cudahy Police Officers; Brian Olson is a police canine officer. Id. at ¶¶2, 4-5.

B.    <u>Arrest</u>

On May 24, 2014, at 6:05 p.m., a 911 caller reported a black male in the lobby of a multi-family dwelling at 6020 South Buckhorn Avenue in Cudahy, Wisconsin. Id. at ¶8. The caller, Jason Riviera, said the man threatened to kill him and his wife, and was attempting to enter the building. Id. The caller described the suspect as a thin, tall, black male wearing a green t-shirt and jeans and carrying a backpack. Id. at ¶ 9. The caller said the suspect had reentered the building. Id. It was unclear whether the plaintiff belonged or resided at the location. Id. at ¶10. City of Cudahy police officers were dispatched to respond to the call, including Sergeant Glen Haase, Robert Jachowicz, Brian Olson and Andrew Ayala. Id. at ¶¶8, 23.

Haase was the first to arrive on the scene; he met spouses Jason and Kelly Rivieria, and they told him what had just happened. Id. at ¶¶11-12. The Rivieras were waiting in an unsecured lobby for their sons to arrive home, and Kelly was standing near a table with a newspaper on it. Id. at ¶13. The black male, later identified as the plaintiff, entered the lobby and asked Kelly if the paper was hers; she said no, and asked if it was the plaintiff's. Id. at ¶14. The plaintiff replied no, and accused Kelly of trying to steal the paper. Id. Kelly then walked away, toward Jason in the unsecured lobby area. Id. at ¶15.

Jason saw the plaintiff use a key to enter the secure doors leading to the elevator. Id. at ¶16. The plaintiff was talking on his cell phone. Id. Jason said he heard the bell to the elevator ring and thought the plaintiff entered the elevator, but then the plaintiff exited the secure door back into the unsecured lobby. Id.

Kelly was sitting on the wicker couch next to the table, and the plaintiff sat on a wicker chair next to her. Id. at ¶17. The plaintiff said to Kelly something like, "So about stealing the paper." Id. Kelly told the plaintiff she did not steal anything. Id. The plaintiff rose up out of the chair, kicked Kelly in the leg, formed his hand as if he was about to choke her, and yelled that that he was going to kill her. Id. at ¶ 18.

Jason jumped in to separate them and told the plaintiff he was calling the police. Id. at ¶19. As Jason made the call, the plaintiff re-entered the secure part of the building, then fled out of the south exit. Id. at ¶20.

Haase was concerned that the suspect could still be in the very large, multi-floor building or could have gone through the building and exited. Id. at ¶21. Haase wanted to try to contain the area so officers could search the building if necessary. Id. at ¶22. Haase radioed to the other officers and gave them the information about the suspect; he asked them to set up a perimeter around the building. Id. at ¶24. One of the officers had observed an individual matching the description of the suspect in the next property, on top of a building that was under construction. Id. at ¶25.

Jachowicz drove the police transport van to the south and west of the building, and immediately saw a person (the plaintiff) matching the description of the suspect. Id. at ¶¶26-27. When Jachowicz first encountered the plaintiff, he was thirty yards from the apartment building and walking away from it. Id. at ¶30. When Jachowicz saw the plaintiff walking away from the building, he radioed to the other squads to inform them. Id. at ¶35. The nature of the call (that the suspect had threatened to kill Kelly Riviera) heightened Jachowicz's awareness for his safety and the safety of the community. Id. at ¶34. Jachowicz testified at trial that officers want to make sure to detain a suspect who just threatened to kill someone. Id.

Jachowicz had his overhead lights activated; he got out of his vehicle, announced that he was a Cudahy police officer, and yelled to the plaintiff to stop and that he was under arrest. Id. at ¶31. The plaintiff looked toward Jachowicz, but did not stop. Id. at ¶32. The plaintiff started walking backward, which concerned Jachowicz because he feared the plaintiff was going to flee the scene. Id. at ¶33.

At that time, Ayala and Olson (and Olson's canine) had arrived on the scene. Id. at ¶36. Olson got out of his squad car; placed his police service canine, Ezzo, on a leash; and began to walk toward the plaintiff, who was about fifty yards away. Id. at ¶37. The officers walked toward the plaintiff, and Jachowicz shouted commands for the plaintiff not to move and that he was

under arrest. Id. at ¶38. Jachowicz again told the plaintiff to stop, but he refused to stop. Id. at ¶39.

Olson believed the plaintiff was going to turn and flee, so he began to position himself and Ezzo to get behind the plaintiff in case he ran. Id. at ¶¶40-41. Olson also commanded Ezzo to bark at the plaintiff in the hope of gaining the plaintiff's compliance. Id. at ¶42.

The plaintiff took his backpack off, which further heightened Jachowicz's awareness, because people tend to lighten their load before they take off. Id. at ¶43. The officers did not know what the plaintiff had with him, especially in his backpack, and it was possible he could access and arm himself with weapons at any time. Id. at ¶¶44-45.

After the plaintiff dropped his backpack, Jachowicz decided to initialize further "heavy control talk" by yelling at the plaintiff clearly and concisely to stop and telling him to get on the ground. Id. at ¶46. Jachowicz told the plaintiff to stop, to show his hands, and to put his hands behind his back; he also said the plaintiff was under arrest. Id. at ¶47. Yet the plaintiff continued to walk backward. Id. Instead of getting on the ground, the plaintiff squared off at Jachowicz with an angry, menacing look and failed to follow the officers' commands. Id. at ¶48. While Jachowicz continued with his orders for the plaintiff to surrender, Olson also began to shout at the plaintiff to lie on the ground. Id. at ¶49.

Rather than approaching the plaintiff and having direct physical contact with him, the officers were attempting to give the plaintiff orders to surrender and position himself in a way that would make it safe for the officers to approach him. Id. at ¶50. The plaintiff was not complying with their orders, and refused to get to the ground. Id. at ¶51. Ezzo was barking as the officers were giving orders. Id. at ¶52.

Jachowicz took his service weapon out, pointed it at the plaintiff, and ordered the plaintiff to the ground. Id. at ¶53. Jachowicz did not know what the plaintiff's skill level was or what he had on him. Id. at ¶54. Jachowicz recognized the plaintiff from prior police contacts, and he remembered the plaintiff's propensity toward violence. Id. at ¶55. The plaintiff had fought with City of Cudahy police officers in the past when they had contact with him as a suspect. Id.

Jachowicz walked up to the plaintiff, within three to five feet. Id. at ¶56. The plaintiff then had his hands in the beginning of a surrender ritual, and he was no longer moving backward. Id. Jachowicz reached out with his right hand, held onto the plaintiff, and turned and holstered his weapon. Id. at ¶57. Jachowicz then secured the plaintiff on the ground. Id. The plaintiff never was tackled. Id. at ¶60.

The officers started to handcuff the plaintiff while he was on the ground in the grassy field. Id. at ¶61. The plaintiff began to struggle by kicking and attempting to hold and push the officers' hands off his arms. Id. at ¶62. The

grass was wet, so the officers had a difficult time trying to secure the plaintiff's hands behind his back. Id. at ¶63.

Jachowicz had the plaintiff's right arm, and another officer had the plaintiff's other arm; a third officer was trying to stabilize the plaintiff's body to try to cuff him behind his back. Id. at ¶64. The plaintiff began to pull his arms away. Id. at ¶65. He became combative and resistive as the officers attempted to handcuff him, and he threatened the officers that he was going to kill them. Id. The plaintiff was trying to swing and push and pull away, and then he started kicking and rolling and twisting. Id. at ¶¶66-67. Jachowicz was holding onto the plaintiff's right hand pretty securely, but officers were unable to secure the plaintiff's left hand very well. Id. at ¶68. It took three officers to control the plaintiff because of his resistance, but eventually the officers got the handcuffs on the plaintiff. Id. at ¶¶69-70.

The officers rolled the plaintiff onto his side to assess if he was injured. Id. at ¶71. There were no obvious injuries, and the plaintiff did not complain of any injuries. Id.

C.    Transport

The officers rolled the plaintiff onto his knees, then lifted him and started walking him toward the police van. Id. at ¶72. As the officers were walking the plaintiff to the van, he would stiffen up or completely loosen up, making it very difficult for the officers to walk him. Id. at ¶73. He pushed back with all his might to resist getting into the police vehicle. Id. The plaintiff yelled at

Jachowicz, "I'm going to fucking kill you. I'm going to fucking kill your family." Id. at ¶74.

Olson returned Ezzo to his squad car while the other officers placed the plaintiff in the back of the police transport van. Id. at ¶76. Haase met the other officers and attempted to assist them in placing the plaintiff in the vehicle. Id. at ¶77. Haase smelled a strong odor of alcohol. Id.

The police transport van has a stainless steel container inside where officers secure prisoners. Id. at ¶78. The officers slid the plaintiff into the back of the van and secured the door. Id. at ¶79. Haase decided to have the plaintiff transported to a hospital to have him medically cleared, because his behavior was so wildly unreasonable during the cuffing procedure and he was combative and threatening. Id. at ¶80. Officers have subjects medically cleared for their own protection and to asses any potential problems with the subject before they place them in a jail cell. Id. at ¶81. It appeared that the plaintiff was intoxicated, which was one of the reasons that the officers took him to the hospital rather than directly to jail. Id. at ¶82. The officers wanted to make sure that he was alright. Id.

Jachowicz drove the plaintiff to St. Luke's South Shore Hospital; the trip took about two minutes. Id. at ¶¶83-84. Jachowicz drove in a reasonable and appropriate manner that would have caused no harm or injury to the plaintiff. Id. at ¶85. The plaintiff was yelling and threatening as Jachowicz drove away from the scene. Id. at ¶86. The plaintiff was kicking the back of the stainless

steel door, on the sides of the walls, and the partition between him and Jachowicz. Id. at ¶87. While in the transport van, the plaintiff moved his handcuffed hands from behind his back and slid them underneath himself so that his hands were cuffed in front of his body. Id. at ¶88. Jachowicz viewed this as an aggressive action, because the plaintiff could have reached over and injured people. Id. at ¶¶88-89. Jachowicz's years of experience have shown him that when someone brings their cuffed hands around to the front, it is usually because they have another thought process, such as a possible attack on officers. Id. at ¶90.

D.    Hospital

The plaintiff refused to walk into the hospital under his own power, so he was brought into the emergency room handcuffed to a wheelchair. Id. at ¶91. Jachowicz did not see any injuries to the plaintiff that resulted from the transport, and the plaintiff did not complain of any injuries to Jachowicz. Id. at ¶92. While transporting the plaintiff to the room, Jachowicz held onto the handcuff chain and maintained control of the plaintiff's wrists so he couldn't assault anyone with his hands forward or around anyone's head. Id. at ¶¶93-94.

In the room, the officers pulled the wheelchair up to the side of the bed and lifted the plaintiff into the bed. Id. at ¶94. The plaintiff continued to resist the officers by trying to pull away as they were securing his hands to the bed, but the officers were able to use the bed rails to get handcuffs on two sides. Id.

at ¶¶95-96. The plaintiff was still using threatening and profane language and disturbing other patients in the emergency room. Id. at ¶97. The plaintiff said he would kill all of the officers and find out where their families live and kill them too. Id.

When officers bring a person to the hospital, the person is admitted as a patient. Id. at ¶98. Anything that happens to that patient after the officers deliver them for care is done by the doctor. Id. at ¶99.

The doctor at St. Luke's South Shore Hospital observed the plaintiff's violent demeanor and his actions and put in an order for padded leg restraints. Id. at ¶100. The medical record states, "Restraint initiated/used because behavior indicates imminent danger to others is present/persists. Restraint Type: Soft ankle left, Soft ankle right." Id. at ¶101.

The plaintiff attempted to punch the attending physician, but he was unsuccessful because he was handcuffed to the bed. Id. at ¶102. The medical record states:

> Patient is physically combative. He attempted to punch me but because he was cuffed to the bed only tapped my lower left chest with his fist. Patient needs to be medically restrained for evaluation for his safety and the safety of the staff and law enforcement. No evidence of trauma and no focal neurological deficits.

Id. at ¶102. The medical records also state: "Pt non-compliant, agitated, intoxicated; screaming profanities, kicking, swinging arms, attempting to hit police officers and staff, making death threats toward police and staff." Id. at ¶103.

The medical staff at the hospital determined that the plaintiff needed to submit to a blood draw so they could determine what substances were contributing to his unreasonable behavior. Id. at ¶105. The doctor put in an order for a blood draw and a urine sample for medical clearance. Id. The purpose of medical clearance is to ensure the plaintiff's safety to make sure that there is not something "grossly medically wrong with him." Id. at ¶106.

Emergency room technician Alexandra Cobb was working under the doctor's supervision. Id. at ¶¶107-08. Officers were trying to get the plaintiff to lie down on the bed so that Cobb could take the plaintiff's vital signs. Id. at ¶110. Cobb told the plaintiff that she needed to draw blood, as ordered by the doctor. Id. at ¶111. Both the doctor and Cobb asked for the plaintiff's consent for the blood draw, but he refused to give it. Id. There were at least three police officers in the room, including one to the right of Cobb, to protect her in case anything happened. Id. at ¶112. Cobb was on the side of the bed, about two to three feet away from the plaintiff; she then approached the bed with the tools that were needed to draw blood and talked to the plaintiff about what she was doing. Id. at ¶113. The officers also told the plaintiff what was happening and that the blood draw had to be done. Id. at ¶114.

An officer was about to hold the plaintiff's arm when the plaintiff spit a big glob of spit onto Cobb's shirt. Id. at ¶115. An officer immediately pushed Cobb out of the way to protect her, and Jachowicz quickly secured the plaintiff's head towards the pillow so that he could not spit on anyone else. Id.

at ¶¶116-17. Jachowicz used an open hand and pushed the plaintiff's head towards the pillow so he could not spit out. Id. at ¶118. Jachowicz says that the plaintiff was able to breathe, but the plaintiff swears that he could not breathe when Jachowicz placed the plaintiff's face in a pillow. Id.; Dkt. No. 46 at 4.

Ayala got Cobb away from the situation so that she would not be assaulted again and so that she could change the uniform that had been spit on. Id. at ¶119. Officers brought in a spit hood, which is an elasticized mesh hood that officers pull over the subject's head. Id. at ¶120. The spit hood does not prevent the subject from breathing; it is open air, with dense mesh all the way around. Id.

The plaintiff continued to thrash about and resist the restraints that held him to the bed. Id. at ¶121. Officers physically held the plaintiff down so Cobb could do the blood draw. Id. at ¶122. Cobb described the plaintiff as yelling, upset, mad, angry, uncooperative, swearing, hostile, hitting, combative, inconsolable, inappropriate, kicking, spitting and attempting to hit police and hospital employees. Id. at ¶124. Eventually, Cobb drew the plaintiff's blood, and his blood alcohol content was .376. Id. at ¶¶123, 125. Once the plaintiff was medically cleared, he was transported to the Milwaukee County Jail. Id. at ¶126.

## II.     DISCUSSION

### A.     Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgement as a matter of law." Fed. R. Civ. P. 56(c); <u>Ames v. Home Depot U.S.A., Inc.</u>, 629 F.3d 665, 668 (7th Cir. 2011). The movant bears the burden of establishing that there are no genuine issues of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). If the movant meets this burden, the non-movant must designate specific facts that establish that there is a genuine triable fact. Fed. R. Civ. P. 56(e). The court grants summary judgment when no reasonable jury could find for the non-moving party. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

### B. <u>Fourth Amendment</u>

"*All* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." <u>Graham v. Connor</u>, 490 U.S. 386, 395 (1989) (emphasis in original). "This inquiry involves 'a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" <u>Abdullahi v. City of Madison</u>, 423 F.3d 763, 768 (7th Cir. 2005) (quoting <u>Graham</u>, 490 U.S. at

14

396). "Not surprisingly, this analysis is 'not capable of precise definition or mechanical application' but 'requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" Id.

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396. For excessive force claims, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Id. The right to make an arrest "necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Id. "As in other Fourth Amendment contexts, the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Id. at 397.

C.    Arrest

The defendants submit that any use of force during and after the plaintiff's arrest was objectively reasonable. The plaintiff argues that the

defendants' actions were unreasonable. He insists that he was just a private citizen taking a walk who had committed no crime, but suddenly was surrounded by officers shouting conflicting commands and a canine officer barking on him. Dkt. No. 46 at 2-4. The plaintiff insists that he could not comply with all the orders in a confusing situation, but his primary concern regarding force used during his arrest seems to be his allegation that Jachowicz briefly pointed his service weapon at the plaintiff's head prior to the plaintiff's surrender. Id.

The court must judge the use of force, not from the plaintiff's perspective, but from the perspective of a reasonable officer on the scene. See Graham, 490 U.S. at 396. The officers were responding to reports that a suspect had threatened to kill someone, and the plaintiff fit the description of the suspect. It is not clear exactly when commands became conflicting, but the plaintiff backed away from Jachowicz even as the officer told him to stop. Then the plaintiff dropped his backpack, which led Jachowicz to believe he might be lightening his load to flee. The plaintiff maintains that he was backing away, not advancing, and that he was not being combative. Ultimately, Jachowicz saw the plaintiff square off "with an angry, menacing look," instead of getting on the ground. Dkt. No. 37 at ¶48.

Instead of approaching the plaintiff and having direct physical contact with him, Jachowicz briefly took his service weapon out and pointed it at the plaintiff. Id. at ¶¶50, 53. Jachowicz did not know if the plaintiff was armed,

believed he had threatened to kill someone, and remembered that the plaintiff had fought with police officers in the past when they had contact with him as a suspect. Id. at ¶¶54-55. As Jachowicz walked toward the plaintiff with his gun pointed at him, the plaintiff put his arms up and stopped moving backwards. Id. at ¶56. As soon as he had a hand on the plaintiff, Jachowicz holstered his weapon. Id. at ¶57.

"[G]un pointing when an individual presents no danger is unreasonable and violated the Fourth Amendment." Baird v. Renbarger, 576 F.3d 340, 345 (7th Cir. 2009) (citations omitted). "Conversely, courts do not find constitutional violations for gun pointing when there is a reasonable threat of danger or violence to police." Id. at 346-47 (citations omitted). No reasonable jury could conclude that Jachowicz's actions were unreasonable in light of the information Jachowicz had regarding the plaintiff at the time, and in light of the plaintiff's behavior. The same is true for the officers' use of some force as they attempted to place handcuffs on the plaintiff and walk him to the police transport vehicle while he resisted and shouted obscenities and threats at them. The court will grant the defendants' motion for summary judgment with regard to this portion of the plaintiff's claim.

D.  Transport

The plaintiff makes the general assertion that he was injured during his ride in the police transport van, and would not have been if he had been properly secured. Dkt. No. 46 at 4. He provides no further details regarding the

extent of his injury, if any, or how it occurred. This does not constitute sufficient evidence to prove a genuine dispute as to an issue of material fact, or to allow the plaintiff to prevail as a matter of law. The undisputed facts reveal that the ride to the hospital took only two minutes, and that Jachowicz drove in a way that would not have caused any injury. Dkt. No. 37, <u>Id.</u> at ¶¶83-85. During that brief ride, the plaintiff yelled and threatened Jachowicz, kicked the sides of the vehicle, and moved his handcuffed hands from behind his body to the front of his body. <u>Id.</u> at ¶¶86-88. When they arrived at the hospital, Jachowicz did not notice any injuries to the plaintiff, and the plaintiff did not complain of any injuries to Jachowicz. <u>Id.</u> at ¶92. The court also will grant the defendants' motion for summary judgment regarding this portion of the plaintiff's claim.

 E. <u>Hospital</u>

Finally, the defendants argue that they are entitled to summary judgment because their actions at the hospital were objectively reasonable given the situation. Throughout his time at the hospital, the plaintiff was resistant and combative. The doctor, for his safety and that of his staff, had to order leg restraints and that the plaintiff be handcuffed to the hospital bed. <u>Id.</u> at ¶¶100-101. The plaintiff attempted to punch the doctor, but was thwarted by his handcuffs. <u>Id.</u> at ¶102. The plaintiff spat on Cobb when she tried to draw the blood for the tests the doctor ordered; while the plaintiff describes this as self-defense against the unwanted blood draw, he does not dispute that

he did it. Id. at ¶¶115. After the plaintiff spat on Cobb, Jachowicz secured the

plaintiff's head to the pillow to keep him from spitting on anyone else before the

other officers could find a spit mask.[2] Id. at ¶¶116-18. Officers still had to hold

the plaintiff down so Cobb could do the blood draw. Id. at ¶122. The officers'

use of force to restrain the plaintiff at the hospital was "objectively reasonable"

as a matter of law. See Graham, 490 U.S. at 397. No reasonable jury could

conclude that the force used was unreasonable to protect the plaintiff, the

medical staff and the officers, given the plaintiff's behavior at the hospital.

The real crux of the plaintiff's claim regarding what happened at the

hospital, though, is his insistence that the defendants needed a search warrant

to draw his blood. "Even in prison, case law indicates that the Fourth

Amendment protects, to some degree, prisoners' bodily integrity against

unreasonable intrusions into their bodies." King v. McCarty, 781 F.3d 889, 900

(7th Cir. 2015) (citations omitted).

The plaintiff was at the hospital for medical clearance before he could be

transported to jail, and the *doctor* ordered a blood draw and a urine sample as

part of that process. Id. at ¶105-06. The defendants did not order the blood

draw, or use it to obtain evidence against the plaintiff. As the plaintiff himself

---

[2] The parties dispute whether the plaintiff could breathe while Jachowicz had
the plaintiff's head secured to the pillow, but this dispute is not material. See
Dkt. No. 37 at ¶¶ 117-18; Dkt. No. 46 at 4. There is no indication that the
plaintiff suffered any injury from any temporary inability to breathe, especially
since he was able to continue to thrash about and resist the restraints. Dkt.
No. 37 at ¶121.

notes in his brief, "the officers never stated [his] blood alcohol level in any police report, neither did they state it under oath while [he] was on trial." Dkt. No. 46 at 5-6. This supports the defendants' position that the blood draw was ordered by the doctor as part of the plaintiff's medical clearance, rather than at their behest in search of evidence regarding any criminal investigation.[3]

In Sullivan v. Borneman, 384 F.3d 372 (7th Cir. 2004), the Seventh Circuit concluded that there was no Fourth Amendment violation when officers restrained the plaintiff during a catheterization that was part of a medical clearance procedure. The court emphasized that the catheterization was performed "solely to assure Sullivan's medical well-being before he was transported to the county jail." Id. at 376. It expressed "no opinion" as to how its analysis would be different if, for instance, the catheterization was done to compile evidence. Id. The situation in this case is similar to the one in Sullivan—a medical professional directed the blood draw for medical clearance purposes, and the defendants were involved only to assist and protect the medical staff. Arguably, a blood draw is less intrusive than the insertion of a catheter. See Sparks v. Stutler, 71 F.3d 259, 261 (7th Cir. 1995) ("A catheter is more intrusive than a needle but less intrusive than a scalpel . . . .").

The court will grant the defendants' motion for summary judgment as to this portion of the plaintiff's claim, and will dismiss the case.

F.    Qualified Immunity

---

[3] The plaintiff has a separate lawsuit pending against the medical professionals regarding the blood draw. See Brown v. Radar, No. 15-cv-238-pp (E.D. Wis.).

Because the court has found that the plaintiff has not raised a genuine dispute of material fact and has not proven a constitutional violation as a matter of law, the court need not address the defendants' arguments that they are entitled to qualified immunity.

## III. CONCLUSION

The court **DISMISSES WITH PREJUDICE** the plaintiff's claims against John Doe, Officer, City of Cudahy Police Department.

The court **GRANTS** the defendants' motion for summary judgment and **DISMISSES** this case. Dkt. No. 35. The court **DIRECTS** the clerk of court to enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30** days of the entry of judgment. See Federal Rule of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. See Federal Rule of Appellate Procedure 4(a)(5)(A).

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28** days of the entry of judgment. The court cannot extend this deadline. See Federal Rule of Civil

Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. See Federal Rule of Civil Procedure 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 31st day of August, 2017.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**United States District Judge**